**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>v. )<br>)<br>GARY SINDEN, )<br>)<br>Defendant. ) | Criminal Action<br>05-03074-01-CR-S-RED |

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

Defendant filed a Motion to Suppress Evidence and Statements, in which he asserts that evidence and statements seized as a result of a search of his person on April 13, 2004, should be suppressed. The United States filed its response. The matter was set for an evidentiary hearing, which was held before the undersigned on September 29, 2005. The defendant was present with counsel, Nancy Price, Assistant Federal Public Defender, and the United States was represented by Angela Hasty, Special Assistant United States Attorney.

It is defendant's position that there was no probable cause to justify the search of his person.

The United States first called Pulaski County Police Department Officer James Beezley. On April 13, 2004, at about 10:30 p.m., when he was working for the Dixon Police Department, he saw a vehicle in Baden's Storage Lot. He tried to make contact because there had been reports of vandalism and thefts at that lot. As he approached, he saw a second vehicle, parked, with the drivers facing each other. As the officer pulled up and exited his vehicle, defendant opened the passenger side door. Officer Beezley went over to the door to make contact because he couldn't

1

get between the two vehicles.  He also recognized the vehicles as belonging to Ms. Fenton and defendant.  He knew Frances Fenton had been involved in narcotics activity, and he had unsubstantiated intelligence information that defendant had also. His main reason for stopping them, however, was because of the thefts and the fact that it was late at night.  Officer Beezley testified that when defendant opened his car door, he looked inside and noticed a magazine with bullets on the floorboard in plain view.  He then asked defendant if there was a gun in the vehicle.  Defendant opened the console and pulled the gun out, holding it between his fingers.  The officer asked defendant to put the gun down.  He then asked the driver in the other vehicle to leave because he was by himself.

Officer Beezley testified that he went around to the driver's side of the vehicle and had defendant exit the vehicle so he could put him in handcuffs for his safety.  He checked him for additional weapons, as a precautionary measure.  While he was frisking him, the officer felt a round, narrow object.  He looked in defendant's jacket and found a modified pen with the top removed in his back pocket.  Through his experience, such a pen is usually used to ingest powdery, controlled substances nasally. He asked defendant if there were any other controlled substances, and defendant said there was not.  He then handed the officer a piece of foil that he said he had gotten from the other driver.  He reached around into his pocket with handcuffs on to retrieve the foil. Officer Beezley did not believe that there was any residue or substance on the foil.  The officer then conducted a further search and retrieved a sandwich bag of off-white powder in a pocket of his jeans, which tested positive in the field for methamphetamine.  This was a continuation of the frisk of defendant.  After he had located the bag and had found the pen with the residue, he arrested defendant for possession of drug paraphernalia.

2

On cross examination, Officer Beezley testified that he had training and had been a deputy sheriff for years. He admitted that he had followed defendant's girlfriend when he thought there had been warrants out for her, which there weren't. He was also present during a stop where a vehicle was searched that defendant's daughter was a passenger in.

When he approached the lot on the night in question, he didn't see the vehicles at first, but then he saw them in the rear view mirror. The cars were parked in a way that the side-view mirrors were essentially touching. He pulled in the lot and positioned his vehicle in front of defendant's vehicle, which blocked the back of the other vehicle. The officer realized he couldn't contact the individuals by going between the vehicles because they were too close. He stated that defendant leaned over and started to open the passenger door as he was approaching the vehicles on foot. He had suspicions of narcotics activity, even though all he had seen was a gun that night. The officer admitted that he had no information about criminal activity that night that involved defendant. He had just been told to check the business lots and the square in town because of reports of vandalism and theft. He doesn't remember any reports about that particular lot. The officer admitted that he stated in his report and sworn statement that he asked defendant to exit the vehicle, that he placed him in handcuffs for officer safety, and that he then began a probable cause search. He acknowledged that it appeared from his report that the search that resulted in him finding the modified pen straw occurred after his pat down for officer safety. He did not recall asking the other driver why she was there or what they were doing.

On redirect examination, the officer stated that he would have stopped and investigated any vehicles that were parked late at night in the storage area. He did not recognize the vehicles as belonging to defendant and Ms. Fenton at first. He had previous information that defendant was

3

involved in methamphetamine cooking. He was frisking the defendant when he found the pen.

On recross examination, Officer Beezley stated that when he looked in the rear view mirror, he recognized Francis Fenton's vehicle, or at least, when he turned around he recognized the vehicle as hers.

Defendant called Frances Fenton to the stand. She testified that she is acquainted with defendant. She was on the lot of Baden Storage that night. She pulled into the lot to ask defendant for money for gas. She saw Officer Beezley pull up. She knew him and he knew her. He was familiar with the vehicle she drives. Ms. Fenton testified that she saw the officer get out of his car, walk around to defendant's truck on the passenger side, and ask him what they were doing. He then opened the passenger side door and there was a gun clip in the seat. She testified that he then asked where the gun was, and defendant opened the console where the gun was. She did not see defendant reach across the seat, and did not see him open the passenger door. She admitted that she probably could have driven away if she wanted to, but she probably would have gotten into trouble. He asked her what she had been doing and she told him, so he said she could go. She stated that they were not parked near the storage unit. Officer Beezley had pulled her over a few times in the past, perhaps five times, and she felt he was harassing her.

On cross examination, Ms. Fenton testified that the officer never told her she wasn't free to leave. She admitted it was late and dark, and that defendant had a gun, which he showed to the officer. She stated that defendant was handing her money. She admitted that she had been involved in cases in which narcotics were involved in the past.

Defendant asserts that at the time Officer Beezley handcuffed him, he was subjected to a de facto arrest, and that the officer did not have probable cause to believe that he had committed a

4

crime. Just prior to putting him in handcuffs, the officer patted him down for officer safety. After that pat down and being placed in handcuffs, defendant contends that the officer then conducted the search of his person, for which there was no probable cause. At the conclusion of the hearing, defendant contended that he was seized as soon as Officer Beezley drove into the lot, and that there was no reasonable suspicion to make him exit the vehicle.

The government contends that the officer had reasonable suspicion to stop defendant when he observed the cars, late at night, inside a storage area where several burglaries had occurred. Once he was stopped, it is argued that he could be frisked because there was sufficient evidence that he was armed. This included the magazine in plain view in defendant's car, and the firearm. It is asserted that he was properly frisked and a glass smoking pipe was found. The government contends that during the frisk defendant voluntarily turned over methamphetamine to the officer.

In United States v. Barry, 394 F.3d 1070, 1074 (8th Cir. 2005), the Eighth Circuit made clear that not every encounter with law enforcement constitutes a seizure. In facts similar to this case, an officer approached vehicles parked in an area that had experienced some crime in the past. The officer drove into the lot, and parked his marked cruiser in front of a parked vehicle, with the intention of investigating to see if any criminal activity was going on, or if the occupants needed assistance. The Court held that the officer's "conduct in approaching Barry's parked vehicle and knocking on the window did not amount to a show of authority such that a reasonable person would believe he was not at liberty to ignore [the officer's] request and go about his business." Id. at 1075. The officer "had merely approached a parked vehicle, which the Fourth Amendment permits." Id. In fact, the Eighth Circuit concluded that the officer "probably would have been remiss had he ignored the vehicle parked in an alley behind closed stores at 11:18 p.m." Id. The Court found that

5

defendant was not seized until the officer asked him to exit the vehicle. Id. The Court held that the Fourth Amendment was not implicated by the initial encounter between the officer and the defendant, but that once the officer saw the mist and smelled marijuana, he had reasonable suspicion to detain defendant. Id. at 1078.

In this case, the testimony adduced at the hearing established that Officer Beezley was patrolling an area that had experienced theft and vandalism. It was 10:30 at night as he drove by a storage lot, and noticed vehicles parked there. Because of the reports of theft and vandalism in the area, he decided to investigate to see if any criminal activity was occurring. He also recognized the occupants of the vehicles and had some information that they had been involved in narcotics activity. He observed the two vehicles parked side by side with the driver's side-view mirrors touching. Because he could not get in between the vehicles to speak to the drivers, he walked around by the passenger side of defendant's vehicle. It was Officer Beezley's testimony that defendant reached over towards the passenger door and opened it. In his incident report and his Statement of Probable Cause, he stated that defendant opened the door. Officer Beezley then saw, in plain view, a magazine with bullets lying on the floor near the gear shift. When he asked defendant where the gun was, defendant reached into the console of the truck and produced a gun. Because he was by himself, he told Ms. Fenton to leave. He then told defendant to exit the vehicle.

Based on clearly established law in the Eighth Circuit, up until the officer instructed defendant to exit the vehicle, the Fourth Amendment was not implicated in this case. There was no Fourth Amendment violation during the initial consensual encounter. Id. at 1075.

The events that ensued after that were clearly within the parameters of a valid Terry stop, based on reasonable suspicion of criminal activity. Terry v. Ohio, 392 U.S. 1 (1968). At the point

6

that defendant exited the vehicle, the officer handcuffed him and searched him for additional weapons. It is well established that when officers are presented with serious danger in the course of carrying out an investigative detention, they may constrain the suspect with handcuffs in order to control the scene and protect their safety. See United States v. Fisher, 364 F.3d 970, 973-74 (8th Cir. 2004); United States v. Navarrete-Barron, 192 F.3d 786, 789-91 (8th Cir. 1999) (officers did not exceed limits of Terry stop by drawing weapons and handcuffing drug trafficking suspect who may have been armed).

Further, during a Terry stop, "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others," the officer may conduct a pat-down search "to determine whether the person is in fact carrying a weapon." Terry, 392 U.S. at 24. After considering the totality of the circumstances, the Court concludes that the decision to conduct the pat-down search was proper under the Fourth Amendment. In conjunction with the lawful search to ensure that defendant did not have additional weapons, Officer Beezley discovered the modified pen, which he recognized as drug paraphernalia. The law is clear that a law enforcement officer may seize contraband that is incidentally found in "plain touch" during a Terry frisk. See United States v. Bustos-Torres, 396 F.3d 935, 943-45 (8th Cir. 2005)(an officer may seize an object in plain view provided the officer is lawfully in the position from which he views object, the object's incriminating character is immediately apparent, and the officer has a lawful right to access the object). Officer Beezley then arrested defendant for possession of that paraphernalia.

Given the fact that the officer found defendant in a parking lot late at night with a gun and ammunition in his vehicle, he clearly had reasonable suspicion of criminal activity sufficient to

7

detain him at that point. Further, it was reasonable for him to handcuff him while he conducted a pat-down search for officer safety. Based on the fact that he then found drug paraphernalia during a routine pat-down search of his person, the officer had probable cause to arrest defendant for possession of that paraphernalia. Accordingly, the Court finds that, based on the totality of the circumstances, the officer's conduct was not violative of the Fourth Amendment. It must therefore be recommended that defendant's motion to suppress be denied.

Based on the foregoing, the Court finds that there is no basis to suppress the evidence and statements in this case. It will be recommended that the Motion to Suppress Evidence and Statements be denied.

For the foregoing reasons, it is, pursuant to the governing law and in accordance with Local Rule 72.1 of the United States District Court for the Western District of Missouri,

RECOMMENDED that defendant's Motion to Suppress Evidence and Statements be denied.

/s/ James C. England
JAMES C. ENGLAND
United States Magistrate Judge

Date: 10/14/05